**UNITED STATES DISTRICT COURT
DISTRICT OF MAINE**

| | |
|---|---|
| **ROBERT HARRIS,** )<br>)<br>　Appellant, )<br>)<br>v. )<br>)<br>**ROSA SCARCELLI, and** )<br>**OAK KNOLL ASSOCIATES LP,** )<br>)<br>　Appellees, ) | 2:15-cv-00071-JDL |

**ORDER ON BANKRUPTCY APPEAL**

Robert Harris appeals from the Judgment and Memorandum of Decision (ECF No. 1-3; ECF No. 1-4) entered on February 2, 2015, by the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court") in which the Bankruptcy Court granted the Motion for Summary Judgment filed by the appellee, Rosa Scarcelli, as consented to by the Debtor, Oak Knoll Associates LP ("Oak Knoll"). Harris filed a notice of appeal to the United States Bankruptcy Appellate Panel for the First Circuit on February 5, 2015. Scarcelli elected to have the District Court hear the appeal and on February 19, 2015, the Bankruptcy Appellate Panel for the First Circuit issued an order transferring the appeal to the District Court, which has jurisdiction over this matter pursuant to 28 U.S.C.A. § 158(a)(1) (2015).

**I. FACTUAL BACKGROUND**

At all times relevant to this case, Scarcelli and her mother, Pamela Gleichman, were general partners of Oak Knoll, with Gleichman serving as managing partner. ECF No. 1-4 at 2. In 1988, Oak Knoll purchased several low-income apartment

buildings located at 554 Connecticut Avenue, Norwalk, Connecticut (the "Property"). App. 583; ECF No. 1-4 at 2.[1] The purchase was made with a loan from the Connecticut Housing Finance Agency ("CHFA") which was evidenced by a promissory note and secured by a mortgage on the Property. *Id.* A condition of the loan required Oak Knoll to agree to certain restrictive covenants concerning the Property, including rent restrictions and prohibitions on the pre-payment or assignment of the mortgage. ECF No. 6 at 10; App. 584.

On May 17, 2011, Harris and Oak Knoll signed a Non-Exclusive Agency Sale Agreement (the "Listing Agreement"), which was to remain in effect for six months. App. 636-37. The following provision of the Listing Agreement, governing the payment of the brokerage commission, is at the heart of this dispute:

> OWNER agrees that if the property is sold during the term of this Agreement to a Purchaser, procured by Agent during the term of this Agreement as outlined above, OWNER will pay AGENT a commission per Schedule A attached. Should negotiations continue after the six (6) month period the OWNER agree [sic] to automatically extend this agreement and its terms until such [sic] as the negotiations are completed.
> The commission shall be due and payable by certified check in full upon the closing of title (or lease execution). *If, during the term hereof, or within six (6) months from the termination of this Agreement, should there be an acceptance of an offer to purchase/lease from the PURCHASER, OWNER agrees to pay the AGENT a commission as per this AGREEMENT.*
> This Agreement shall become effective immediately and shall remain in effect six (6) months from the date hereof.

App. 636 (emphasis added).

---

[1] The parties' appeal briefs and the Bankruptcy Court's memorandum of decision are cited by reference to their CM/ECF numbers. Other documents that appear in the appeal record are cited as "App. ___."

By October 2011, Harris had located a potential buyer, Navarino Capital Management, LLC ("Navarino"), which signed a purchase and sale agreement for the Property with Oak Knoll on October 11, 2011 (the "2011 P&S"). App. 1036-51. The 2011 P&S stated a purchase price of $6,300,000, with Navarino tendering an earnest money deposit of $300,000 to an escrow agent. *Id.* at 1037. Under the agreement, Navarino had 45 days to inspect the Property (the "Inspection Period") and could terminate the agreement "for any reason or no reason" by delivering a notice of termination to Oak Knoll prior to the end of the Inspection Period. *Id.* at 1039. Section 2.3 of the 2011 P&S required Oak Knoll to convey the Property "free and clear of liens and encumbrances" at the closing, subject to certain specified exceptions which were identified in § 2.1 as "Permitted Exceptions." App. 1038. Any liens and encumbrances not specifically identified in Article II were deemed to be "non-Permitted Exceptions." *Id.* In the event that Navarino discovered any non-Permitted Exceptions during the Inspection Period, then, pursuant to § 2.1, Oak Knoll could elect not to cure them, at which point Navarino could either terminate the 2011 P&S or proceed with the purchase of the Property at the agreed-upon price. *Id.*

On November 11, 2011, Navarino requested the first of a series of extensions of the Inspection Period because it discovered that 20 apartments at the Property were subject to rent restrictions imposed by the CHFA. App. 1132. The rent restrictions constituted non-Permitted Exceptions under § 2.1 of the 2011 P&S. App. 1038, 1132. Oak Knoll agreed to the extension, and to multiple extensions thereafter,

while Navarino completed its due diligence and Oak Knoll attempted to remove the rent restrictions. *See* App. 1138-39.

On February 24, 2012, Navarino wrote to Oak Knoll, indicating that it was "willing to allow the inspection period to terminate" and proposed two scenarios in which it would be willing to purchase the Property at a reduced price in light of the rent restrictions. App. 658-59. Before Oak Knoll responded in writing or agreed to either offer, disagreements between Gleichman and Scarcelli over the direction of Oak Knoll's business escalated into litigation. On March 16, 2012, Scarcelli filed an amended complaint in the United States District Court for the District of Maine, seeking, among other things, an order enjoining Gleichman from entering into any contract for the sale of the Property without Scarcelli's consent. App. 660-70. The District Court entered a default judgment granting the requested injunction on May 31, 2012. App. 681-87. Approximately one month later, Scarcelli's attorney wrote to Harris threatening to seek contempt sanctions against him if he continued to market the Property for sale without making required disclosures to Scarcelli. App. 693.

On March 18, 2013, Oak Knoll filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code, 11 U.S.C.A. § 1101, *et seq.* (2015) (the "Bankruptcy Code"). App. 588. Shortly thereafter, on March 21, 2013, Navarino requested the return of its earnest money deposit. App. 734. Then, on April 1, 2013, Oak Knoll filed an application with the Bankruptcy Court to retain Harris as its broker to sell the Property, App. 739-51. The application was never formally acted upon by the Bankruptcy Court, and Oak Knoll withdrew the application six months later, on

4

October 2, 2013, App. 13.  During the interim period, in June, Harris filed a proof of claim for his brokerage services, App. 379-80, to which both Oak Knoll and Scarcelli objected, App. 370-76.

Notwithstanding its objection to Harris' proof of claim, in August 2013, Oak Knoll, through its attorney, instructed Harris to pursue a second purchase and sale agreement with Navarino reflecting a purchase price of $6,275,000.  App. 831.  Harris then contacted Navarino with the terms stated by Oak Knoll, and requested that Navarino provide him with an updated Letter of Intent if the terms were acceptable.  App. 938.

In mid-October 2013, about two weeks after Oak Knoll withdrew its application with the Bankruptcy Court to retain Harris as a broker, Navarino and Oak Knoll executed a second purchase and sale agreement (the "2013 P&S").  App. 589, 880-99.  This new agreement formed the basis of Oak Knoll's plan of reorganization, filed with the Bankruptcy Court on November 25, 2013.  *See* App. 589-90; 864-99.  Although the CHFA initially objected to the plan and sale of the Property, App. 182-329, Oak Knoll ultimately resolved those objections and an amended plan was filed on March 31, 2014, App. 38.  That plan was subsequently confirmed and a sale of the Property to Navarino closed in July 2014.  App. 590.  No commission was paid to Harris.

## II. STANDARD OF REVIEW

A District Court reviews a Bankruptcy Court's grant of summary judgment *de novo.  Rothrock v. Turner,* 2010 WL 2267226, at *2 (D. Me. June 2, 2010).  The

standard for summary judgment in an adversarial bankruptcy proceeding is the same as that provided for by Federal Rule of Civil Procedure 56. *In re Colarusso,* 382 F.3d 51, 58 (1st Cir. 2004); Fed. R. Bankr. P. 7056 (specifying that Fed. R. Civ. P. 56 applies in adversarial bankruptcy proceedings). When deciding a motion for summary judgment, the court construes the record in the light most favorable to the non-moving party. *In re Varrasso,* 37 F.3d 760, 763 (1st Cir. 1994). The court must affirm the Bankruptcy Court's decision if no genuine issue of material fact exists, and if Scarcelli has successfully demonstrated that she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### III. LEGAL ANALYSIS

#### A.   Issues Related to the 2011 Purchase and Sale Agreement

There is no dispute over the language contained in the 2011 P&S, or the fact that Oak Knoll and Navarino executed the 2011 P&S within the term of the Listing Agreement. ECF No. 6 at 25; App. 584-85. What the parties do dispute is Harris' contention that the 2011 P&S triggered Oak Knoll's obligation under the Listing Agreement to pay him a broker's commission. ECF No. 6 at 24. The parties also dispute whether it was necessary for Oak Knoll and Navarino to consummate the transaction with a closing, and whether, by signing the 2011 P&S, Navarino established itself as ready, willing, and able to purchase the Property. *Id.* at 27-28 (citing *Vincent Metro, LLC v. Ginsberg,* 139 Conn. App. 632 (2012)).

The Bankruptcy Court ruled that Harris was not owed a commission because, first, "[t]he Listing Agreement specifically requires a closing and one did not occur by

May 17, 2011[,]" ECF No. 1-4 at 8; second, Navarino was not a ready, willing, and able buyer of the Property during the time frame of the 2011 P&S in light of the CHFA's refusal to permit the sale on terms that were agreeable to both parties, *id.*; and, third, the failure of the 2011 P&S was not caused by either party's unilateral nonperformance, but rather, by the CHFA's refusal to agree to terms for the sale to which both Oak Knoll and Navarino could agree, *id.* at 10.  In this appeal, Harris contends that the Bankruptcy Court "conflated the concepts of offer and acceptance and performance under the [2011 P&S]," ECF No. 6 at 25, and that its conclusion is "baffling" since Navarino ultimately purchased the Property three years later under "substantially identical terms[,]" *id.* at 28.

For the reasons discussed below, I conclude, as did the Bankruptcy Court, that Harris is not entitled to a commission.

**1. A Closing Was Required**

Harris contends that his commission was earned when Oak Knoll and Navarino executed the 2011 P&S.  ECF No. 6 at 24.  For support, he cites the paragraph of the Listing Agreement which provides that if, during the term of the agreement or within six months of its termination, "should there be an acceptance of an offer to purchase/lease from the PURCHASER, OWNER agrees to pay the AGENT a commission as per this AGREEMENT."  *Id.* (quoting App. 636).  Harris argues further that the reference to the commission being "due and payable by certified check in full upon the closing of title (or lease execution)" was intended merely to establish the timing and method of payment of the commission, and not to determine whether

a commission was actually due. *Id.* at 25. The Bankruptcy Court ruled that the Listing Agreement "specifically require[d] a closing and one did not occur by May 17, 2011." ECF No. 1-4 at 8. I agree with this conclusion.

The crux of the matter is this: The Listing Agreement explicitly required that the property be "sold during the term of this Agreement," to a purchaser procured by Harris, in which case the commission was "due and payable by certified check in full upon the closing of title (or lease execution)." App. 636. Because the Property was not "sold" during the term of the Listing Agreement, no commission was earned. Contrary to Harris' argument, this conclusion is not affected by the Listing Agreement's additional provision, that "[i]f, during the term hereof, or within six (6) months from the termination of this Agreement, should there be an acceptance of an offer to purchase/lease from the PURCHASER, OWNER agrees to pay the AGENT a commission as *per this AGREEMENT*." *Id.* (emphasis added). This provision is plainly wedded to the Listing Agreement's requirement that the property be "sold" to a purchaser procured by Harris, with the commission "due and payable by certified check in full upon the closing of title (or lease execution)." *Id.* Thus, Harris' contention that he was due a commission as of Oak Knoll's acceptance of the 2011 P&S is not, in the Listing Agreement's parlance, "per this Agreement."

**2. Navarino Was Not a Ready, Willing, and Able Purchaser**

Even if a sale of the Property were not required for Harris to receive a commission, his claim would still fail because the Listing Agreement also obligated him to procure a ready, willing, and able purchaser. Yet, as the Bankruptcy Court

determined, the 2011 P&S was drafted so that Navarino's readiness and willingness to purchase the Property could not be conclusively determined until it had completed the Inspection Period to its satisfaction. *See* App. 1039 (§ 3.2, 2011 P&S).

Additionally, § 2.3 of the 2011 P&S required Oak Knoll to convey the Property to Navarino "free and clear of liens and encumbrances" at the closing, subject to certain specified exceptions. App. 1038. Under § 2.1, if Navarino discovered any encumbrances on the Property that were not specifically permitted under Article II, Oak Knoll could opt not to cure them. *Id.* If Oak Knoll opted not to cure the encumbrances, then Navarino's options were to either: 1) terminate the 2011 P&S, or 2) proceed with the sale with the encumbrances in place at the original purchase price. *Id.* The first option is essentially what took place during the Inspection Period.

Navarino discovered the CHFA rent restrictions, which were non-Permitted Exceptions under § 2.1, and wrote to Oak Knoll on January 24, 2012, requesting an extension of the Inspection Period and stating that "Oak [Knoll] has not disclosed how it will get a release of the [rent] restrictions that encumber the subject property." App. 657. By the time Navarino sent its February 24, 2012, letter, Oak Knoll still had not cured the encumbrances, and so Navarino offered to purchase the Property subject to the rent restrictions, but at a lower purchase price. App. 658-59. Oak Knoll did not respond to Navarino's offer because of the ensuing litigation between Gleichman and Scarcelli, and Navarino ultimately chose to recoup its earnest money deposit approximately one year later. App. 734 (March 21, 2013, letter to escrow agent requesting return of $300,000 earnest money deposit and stating that "it is

clear that the Seller is unable to convey the property and get a release of the CHFA mortgage which encumbers the property . . . .").

Under Connecticut law, a real estate broker is entitled to a commission only when "he produces a buyer who is ready, willing, and able to purchase *on the terms prescribed by the seller.*" *Menard v. Coronet Motel, Inc.,* 152 Conn. 710, 711 (1965) (emphasis added); *see also Vincent Metro,* 139 Conn. App. at 639; *Urbanksi v. Halperin,* 30 Conn. Supp. 575, 578 (1973). Here, Navarino was not a ready, willing, and able purchaser on the terms prescribed by Oak Knoll because it never expressed its willingness or readiness to purchase the Property at the original purchase price stated in the 2011 P&S, with the rent restrictions in place. *See* App. 658-59.[2]

## B.   Continuing Negotiations

Harris also argues that he is entitled to a commission for his efforts prior to the signing of the 2013 P&S on the theory that the Listing Agreement "automatically renewed under its own terms every six months as long as negotiations between the parties continued." ECF No. 6 at 32 (citing App. 636). He contends that the Bankruptcy Court's judgment should be reversed and remanded for an evidentiary hearing because the record contains disputed facts which would establish that he "did not abandon his efforts" after the termination of the 2011 P&S and "continued

---

[2] Although § 2.1 required that termination of the 2011 P&S take the form of a written notice from Navarino to Oak Knoll, there is no evidence that Navarino provided such notice. Nevertheless, the 2011 P&S may be considered terminated pursuant to § 6.1, which provides that, in the event that Navarino failed to close on the transaction, Oak Knoll could terminate the agreement and return Navarino's earnest money deposit, with both parties being released from all further obligations. *See* App. 1038, 1045-46. The return of Navarino's earnest money deposit and the absence of any subsequent dispute between Oak Knoll and Navarino regarding their respective obligations under the 2011 P&S is strong evidence that the agreement was terminated.

10

negotiating and communicating with [Navarino] at least until the time the Retention Application was withdrawn" on October 2, 2013.  ECF No. 6 at 32-33; App. 13.

The appeal record contains one instance of Harris communicating with Navarino on Oak Knoll's behalf after the termination of the 2011 P&S—Harris' August 21, 2013, email to Navarino in which he relayed Oak Knoll's proposal for a sale of the Property for $6,275,000.  App. 938.  However, by the time that Harris sent this email, the Listing Agreement had been expired for approximately five months, as of the termination of the 2011 P&S upon Navarino's request for its earnest money deposit in March 2013.  App. 734.  Harris' contention that the Listing Agreement automatically extended every six months is misplaced.  The automatic extension to which he refers only applied in the event that ongoing negotiations extended beyond the Listing Agreement's six month term.  App. 636.  Here, there is no evidence in the record of such ongoing negotiations.  Thus, Harris cannot claim a commission pursuant to the Listing Agreement.

Even if the Listing Agreement had not expired, whatever authority Harris enjoyed to negotiate on behalf of Oak Knoll under the Listing Agreement was lost when Oak Knoll filed its Chapter 11 petition in March 2013.  Thereafter, Harris was required to get approval from the Bankruptcy Court before he could negotiate on Oak Knoll's behalf and accrue any post-petition rights to a commission.  *In re Pollock,* 22 B.R. 673, 675 (Bankr. Mass. 1982) ("the general rule is well established, both in the [Bankruptcy] statute and the case law, that in order to be paid for post-petition services to an estate in bankruptcy, the claiming party must first have received court

approval prior to the performance of any service."). Here, the Bankruptcy Court did not grant the necessary approval,[3] and retroactive approval is frowned upon absent extraordinary circumstances which Harris has not argued. *In re Jarvis,* 169 B.R. 276, 277 (Bankr. D. R.I. 1994).

Therefore, even if it is assumed that Harris continued negotiating on Oak Knoll's behalf in connection with the 2013 P&S, those negotiations do not provide a basis upon which he is owed a commission.

## C. Equitable Relief

Finally, Harris contends that he is entitled to an allowed claim under § 105 of the Bankruptcy Code, arguing that he continued to negotiate a price at Oak Knoll's explicit direction even after the bankruptcy petition date. ECF No. 6 at 35. He also claims, more generally, that "[t]his deal would not exist but for [Harris'] brokerage services over *four years* or more[.]" *Id.* (emphasis in original).

The Bankruptcy Court denied Harris' equitable claim, holding that its authority to grant equitable relief under § 105 extended only where necessary "to preserve an identifiable right conferred elsewhere in the Bankruptcy Code." ECF No. 1-4 at 11 (quoting *In re Jamo,* 283 F.3d 392, 403 (1st Cir. 2002)). Here, the court concluded, "[n]either Connecticut law nor the [Bankruptcy] Code confers the right for

---

[3] Although the Bankruptcy Court at first orally approved an application to employ Harris at a hearing held on September 4, 2013, the court conditioned its approval on the requirement that Harris apply with the court for a payment of any commission. On October 2, 2013, the Bankruptcy Court permitted Oak Knoll to withdraw the application. In doing so, the Bankruptcy Court noted that it had never formally approved Oak Knoll's application and stated that the withdrawal of the application to retain Harris was appropriate. Audio Transcript of Bankruptcy Court Status Conference at 1:30, *In re: Oak Knoll Associates, L.P.,* Case No. 13-20205, ECF No. 82.

Harris to receive a commission under these facts[.]" *Id.* I agree with and adopt this conclusion.

## IV. CONCLUSION

For the reasons stated, the judgment of the Bankruptcy Court is **AFFIRMED**.

**SO ORDERED.**

**This 18th day of September, 2015.**

                                                   **/s/ Jon D. Levy**
                                                   **U.S. District Judge**